**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 22-cv-00406-CNS-STV

ABDU-LATIF KAZEMBE ABU-NANTAMBU-EL,

      Plaintiff

v.

JEFF LONG, Warden of Sterling Correctional Facility, in his individual capacity;
JESSICA DORCEY, a Major at Sterling Correctional Facility, in her individual capacity;
MATTHEW BARNES, a Captain at Sterling Correctional Facility, in his individual capacity;
BRADEN PIEL, a Lieutenant at Sterling Correctional Facility, in his individual capacity;
DAVID CUSTER, a Lieutenant at Sterling Correctional Facility, in his individual capacity;
LAUNA COONROD-BROWN, a Case Manager at Sterling Correctional Facility in her individual capacity;
ROBERT DICK, a Case Manager at Sterling Correctional Facility, in his individual capacity;
TIFFANY BEDSAUL, a Sergeant at Sterling Correctional Facility, in her individual capacity;
FNU WALTERS, a Corrections Officer on Unit 4 at Sterling Correctional Facility, in his individual capacity;
FNU LNU #1, a Criminal Investigator on Unit 4 at Sterling Correctional Facility, in his individual capacity;
FNU LNU #2, a Corrections Officer on Unit 4 at Sterling Correctional Facility, in his individual capacity;
FNU LNU #3, a Corrections Officer on Unit 4 at Sterling Correctional Facility, in his individual capacity;
FNU LNU #4, a Corrections Officer on Unit 4 at Sterling Correctional Facility, in his individual capacity,

      Defendants.

---

**SECOND AMENDED COMPLAINT AND JURY DEMAND**

---

     Plaintiff Abdu-Latif Kazembe Abu-Nantambu-El, through his attorneys, Gail K. Johnson

and Eric K. Klein of Johnson & Klein, PLLC, hereby submits this Second Amended Complaint

and Jury Demand (Second Amended Complaint) alleging violations of Plaintiff's constitutional and statutory rights.

## INTRODUCTION

1.      Incarceration is punishment in and of itself. Those who imprison people must ensure that prisoners receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the prisoners. Prison officials have a duty to protect prisoners from violence from other prisoners.

2.      On February 11, 2020, Plaintiff was imprisoned at Sterling Correctional Facility (SCF), a "close custody" facility of the Colorado Department of Corrections (CDOC). Plaintiff remained at SCF even though his convictions had been reversed by the Colorado Supreme Court.

3.      Also imprisoned at SCF was a man named Joshua Cummings. Cummings was serving a life sentence for his having committed an execution-style killing of a Regional Transportation District (RTD) security officer in Denver on January 31, 2017. Cummings was a former U.S. Army soldier who claimed that the killing was connected to Cummings' support for the Islamic State terrorist group ISIS. ISIS is a jihadist group with a particularly violent ideology that claims religious authority over all Muslims.

4.      CDOC staff were well aware of Cummings' violent tendencies and allegiance to this terrorist group. ████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████

5.      In the fall of 2019, Plaintiff complained to several Defendants that he was being repeatedly threatened by other prisoners and that he feared for his safety. Rather than do

anything to protect Plaintiff, Defendants Barnes and Piel blamed him for this danger, telling him

the reason he was having these problems is because he associated with "the fags." With tears in

his eyes, Plaintiff told Defendants Barnes and Piel that he himself is a member of the LGBTQ

(lesbian, gay, bisexual, transgender, and queer) community.

6.      Defendants knew that LGBTQ prisoners face a heightened risk of violence from

other prisoners.

7.      Plaintiff is Muslim, and on multiple occasions in the fall of 2019 and into 2020,

Plaintiff informed various Defendants that Cummings had taken over the Islamic services at SCF

and was implementing Sharia law. Plaintiff informed various Defendants that Cummings had

threatened to beat and/or kill all Muslim prisoners who were LGBTQ, who associated with

people who identify as LGBTQ, or who in other ways committed what Cummings deemed other

major crimes against Sharia law. Other prisoners also informed various Defendants of

Cummings' threats against LGBTQ and other prisoners.

8.      Defendants did not investigate whether Cummings, a known terrorist and ISIS

allegiant who had already committed at least one murder, had made these threats. Defendants did

not move Plaintiff to another housing unit to protect him from Cummings. Nor did Defendants

move Cummings to another housing unit to prevent him from harming Plaintiff. In the face of

violent threats from the convicted murderer and terrorist Cummings towards LGBTQ prisoners

such as Plaintiff, Defendants did nothing to safeguard Plaintiff from Cummings' violence.

9.      To the contrary, Defendants allowed Cummings to be out of his cell at SCF at a

time when the group he belonged to was supposed to have been "locked down" or confined in

their cells. Cummings took advantage of this opportunity and attacked Plaintiff with a sharpened

piece of metal, i.e., a homemade prison shank. In view of multiple SCF security cameras,
Cummings brutally attacked Plaintiff, chasing him around the housing pod and stabbing or
cutting him at least seven times.

10.     When certain Defendants finally entered the housing pod, thus interrupting
Cummings' attack on Plaintiff, they did not obtain immediate, emergency medical care for
Plaintiff. Instead, they handcuffed him and put him in an unsanitary broom closet.

11.     This is the definition of deliberate indifference to a substantial risk of harm.

12.     Defendants' actions were taken under color of state law and proximately caused
the deprivation of Plaintiff's federally protected rights.

## JURISDICTION AND VENUE

13.     This action arises under the Constitution and laws of the United States and is
brought pursuant to 42 U.S.C. §§ 1983, 1985, and 1986. Jurisdiction is conferred on this Court
pursuant to 28 U.S.C. §§ 1331 and 1343. Jurisdiction supporting Plaintiff's claim for attorney's
fees and costs is conferred by 42 U.S.C. § 1988.

14.     Venue in the District of Colorado is proper under 28 U.S.C § 1391(b), because all
of the events relevant to the claims contained herein occurred in the State of Colorado.

## PARTIES

15.     At all times relevant to this Second Amended Complaint, Plaintiff was a citizen of
the United States and resided or was incarcerated in the State of Colorado.

16.     Defendant Jeff Long was, upon information and belief, at all times pertinent to
this Second Amended Complaint, a citizen of the United States and a resident of the State of
Colorado. At all times relevant, he was acting under color of state law as an employee of CDOC,

specifically, as the warden of SCF. Defendant Long was responsible for overseeing all

operations and security at SCF and was responsible for ensuring that CDOC regulations,

policies, and procedures were promulgated to all staff. Defendant Long was responsible for

training SCF staff and ensuring the safety and welfare of SCF prisoners. Defendant Long is sued

in his individual capacity.

17.    Defendant Jessica Dorcey was, upon information and belief, at all times pertinent

to this Second Amended Complaint, a citizen of the United States and a resident of the State of

Colorado. At all times relevant, she was acting under color of state law as an employee of

CDOC, specifically, as a major at SCF. Defendant Dorcey was the programs major and was also

the supervisor overseeing programs, housing, counseling, mental health, and safety and

functioning for LGBTQ prisoners. Defendant Dorcey is sued in her individual capacity.

18.    Defendant Matthew Barnes was, upon information and belief, at all times

pertinent to this Second Amended Complaint, a citizen of the United States and a resident of the

State of Colorado. At all times relevant, he was acting under color of state law as an employee of

CDOC, specifically, as a captain at SCF. Defendant Barnes was the housing captain and

supervisor for SCF Units 3 and 4. Defendant Barnes was responsible for the overall functioning

and operation of these housing units. Defendant Barnes was also responsible for the training of

officers and implementation of policies, procedures, and administrative regulations and the

enforcement of the same. Defendant Barnes was responsible for ensuring the safety of all

prisoners in the housing units he oversaw. Defendant Barnes is sued in his individual capacity.

19.    Defendant Braden Piel was, upon information and belief, at all times pertinent to

this Second Amended Complaint, a citizen of the United States and a resident of the State of

Colorado. At all times relevant, he was acting under color of state law as an employee of CDOC, specifically, as a lieutenant at SCF. Defendant Piel is sued in his individual capacity.

20.    Defendant David Custer was, upon information and belief, at all times pertinent to this Second Amended Complaint, a citizen of the United States and a resident of the State of Colorado. At all times relevant, he was acting under color of state law as an employee of CDOC, specifically, as a lieutenant at SCF. Defendant Custer was the p.m. (2:00 p.m. to 10:00 p.m.) housing lieutenant and supervisor for SCF Units 3 and 4. Defendant Custer was responsible for the functioning and operation of these housing units during that shift. Defendant Custer was responsible for ensuring the safety of all prisoners in the housing units he oversaw. Defendant Custer is sued in his individual capacity.

21.    Defendant Launa Coonrod-Brown was, upon information and belief, at all times pertinent to this Second Amended Complaint, a citizen of the United States and a resident of the State of Colorado. At all times relevant, she was acting under color of state law as an employee of CDOC, specifically, as a case manager at SCF. Defendant Coonrod-Brown is sued in her individual capacity.

22.    Defendant Robert Dick was, upon information and belief, at all times pertinent to this Second Amended Complaint, a citizen of the United States and a resident of the State of Colorado. At all times relevant, he was acting under color of state law as an employee of CDOC, specifically, as a case manager at SCF. Defendant Dick is sued in his individual capacity.

23.    Defendant Tiffany Bedsaul was, upon information and belief, at all times pertinent to this Second Amended Complaint, a citizen of the United States and a resident of the State of Colorado. At all times relevant, she was acting under color of state law as an employee

of CDOC, specifically, as a sergeant at SCF. Defendant Bedsaul is sued in her individual

capacity.

24.     Defendant FNU Walters was, upon information and belief, at all times pertinent to

this Second Amended Complaint, a citizen of the United States and a resident of the State of

Colorado. At all times relevant, he was acting under color of state law as an employee of CDOC,

specifically, as a corrections officer at SCF. Defendant Walters is sued in his individual capacity.

25.     Defendant FNU LNU #1 was, upon information and belief, at all times pertinent

to this Second Amended Complaint, a citizen of the United States and a resident of the State of

Colorado. At all times relevant, he was acting under color of state law as an employee of CDOC,

specifically, as a criminal investigator at SCF. Defendant FNU LNU #1 is sued in his individual

capacity.

26.     Defendant FNU LNU #2 was, upon information and belief, at all times pertinent

to this Second Amended Complaint, a citizen of the United States and a resident of the State of

Colorado. At all times relevant, he was acting under color of state law as an employee of CDOC,

specifically, as a corrections officer at SCF. Defendant FNU LNU #2 is sued in his individual

capacity.

27.     Defendant FNU LNU #3 was, upon information and belief, at all times pertinent

to this Second Amended Complaint, a citizen of the United States and a resident of the State of

Colorado. At all times relevant, he was acting under color of state law as an employee of CDOC,

specifically, as a corrections officer at SCF. Defendant FNU LNU #3 is sued in his individual

capacity.

28.    Defendant FNU LNU #4 was, upon information and belief, at all times pertinent to this Second Amended Complaint, a citizen of the United States and a resident of the State of Colorado. At all times relevant, he was acting under color of state law as an employee of CDOC, specifically, as a corrections officer at SCF. Defendant FNU LNU #4 is sued in his individual capacity.

## FACTUAL ALLEGATIONS

A.    **Plaintiff's life before the preventable stabbing**

29.    Plaintiff grew up in poverty, spending much of his childhood living with his mother, a nurse, in Columbus, Ohio. Tragically, Plaintiff's father, Paul McKnight, Sr., a veteran of the U.S. Air Force and a popular chef at the Cherry Creek Country Club, was shot and killed in the Five Points Area of Denver. At the time of this murder, Mr. McKnight, Sr., was only in his 30s, and Plaintiff was a child about 12-13 years old.

30.    Following the murder, Plaintiff's mother decided they should move to Denver. Plaintiff tried hard to build the foundation for a successful life as he matured as a teen. He attended George Washington High School, where he participated in athletics and other extracurricular activities. He was a prominent player on the football team, he competed in heavyweight wrestling, and he was also on the downhill ski team and the debate team. He also participated in the school's photography club and regularly bowled with other students.

31.    By his senior year of high school, in the late 1970s, Plaintiff hoped to obtain a football scholarship to a four-year college or university; he dreamed of one day playing football professionally. But the only scholarship he received was for a two-year college in Grand Junction. He chose not to attend and instead decided to enlist in the military.

32.     At age 17, as a high-school graduate, Plaintiff voluntarily enlisted in the U.S.

Marines Corps (under his birth name, Paul Delano McKnight, Jr.[1]):



33.     As a private in the Marines, Plaintiff received Basic Airborne training at Fort

Benning, Georgia, and earned a Rifle Sharpshooter Badge. He also completed a 7-week Field

Radio Operator course:



---

[1] In 1996, Plaintiff legally changed his name to Abdu-Latif Kazembe Abu-Nantambu-El.

34.     Plaintiff served as a Field Radio Operator for more than a year and then served as a Parachutist. Plaintiff received advanced paratrooper training, learning how to jump out of helicopters and training for reconnaissance spy missions in which he and one or two other Marines would jump out of small reconnaissance planes.

35.     One night, a terrible accident happened during a training exercise that would impact Plaintiff for the rest of his life. During a night jump from a plane, he landed in a tree, popped his Capewells, incorrectly predicting that the tree branches would hold him, and fell a long way down to the ground, severely injuring his back.

36.     As a result of his back injuries from this accident, Plaintiff has been recognized as disabled by the Department of Veterans Affairs (VA) as well as the CDOC. The VA considers his disability service-connected.

37.     Plaintiff's life was again thrown severely off track when he was wrongly convicted for a sexual assault he did not commit and unjustly incarcerated for many years. In Denver District Court Case No. 86CR1951, Plaintiff was wrongly convicted of first-degree sexual assault and second-degree kidnapping. "During the postconviction proceedings, a scientific test was conducted and it ruled out Abu-Nantambu-El as the contributor of the semen sample found in the victim's underwear." *Abu-Nantambu-El v. State*, 433 P.3d 101, 103 (Colo. App. 2018). On August 6, 1997, after Plaintiff had spent 11 years in prison for his convictions in Case No. 86CR1951, these convictions were vacated by the Denver District Court.

38.     While he was incarcerated in the CDOC on Case No. 86CR1951 for felony crimes he had not committed, Plaintiff was attacked by two other prisoners who were white supremacists. They stabbed him multiple times, and he almost died. He was hospitalized in

Pueblo and given an artificial stomach lining. Doctors placed him on IV antibiotics for a month. Plaintiff still bears a long scar on his abdomen from this incident and also a large scar on his left shoulder.

39.    Plaintiff was again wrongfully convicted of several crimes including first-degree felony murder in Jefferson County District Court Case No. 12CR2275. On December 23, 2019, in *People v. Abu-Nantambu-El*, 454 P.3d 1044 (Colo. 2019), the Colorado Supreme Court affirmed the Colorado Court of Appeals decision reversing Plaintiff's convictions in *People v. Abu-Nantambu-El*, 457 P.3d 648, 649 (Colo. App. 2017).

40.    The Colorado Supreme Court issued its mandate on January 15, 2020, and the court of appeals issued its mandate on February 10, 2020, the day before Cummings tried to kill Plaintiff at SCF by stabbing him multiple times.

41.    Plaintiff was held in CDOC's custody until on or about February 14, 2020, when he was transferred to the Jefferson County Jail to await retrial.

42.    At the retrial in Jefferson County District Court Case No. 12CR2275, a jury acquitted Plaintiff of first-degree felony murder, first-degree burglary (two counts), and false imprisonment; hung on charges of second-degree murder, third-degree assault, and kidnapping; and convicted on a charge of tampering with physical evidence. Plaintiff then entered into a plea agreement with the prosecution in which he pled guilty to manslaughter and third-degree assault and received a stipulated sentence of 12 years in prison, with credit for the time he had served.

**B.    Defendants continue to hold Plaintiff at SCF after he became a pretrial detainee.**

43.    Once the decision of the Colorado Court of Appeals vacating Plaintiff's convictions was affirmed by the Colorado Supreme Court, he became a pretrial detainee.

44.     Following the Colorado Supreme Court's decision on December 23, 2019, Plaintiff repeatedly informed Defendants Dick, Coonrod-Brown, and Long that at that point he was a pretrial detainee and therefore he should be transferred back to the Jefferson County Jail.

45.     Both verbally and in writing (by "kite") Plaintiff informed Defendants Dick, Coonrod-Brown, and Long that he was being illegally held in prison after his convictions had been reversed.

46.     Defendants Dick, Coonrod-Brown, and Long all refused to take any action.

47.     As the result of the refusal of Defendants Dick, Coonrod-Brown, and Long to release Plaintiff from CDOC, Plaintiff remained at SCF until February 14, 2023.

48.     During the 51-day period between the Colorado Supreme Court's affirmance of the reversal of Plaintiff's convictions and the CDOC's eventual transfer of Plaintiff from SCF to the Jefferson County Jail, and as discussed further herein, Plaintiff became the victim of a brutal assault and attempted murder by Cummings.

49.     On February 11, 2020, the date Plaintiff was attacked and stabbed by Cummings, Plaintiff was a pretrial detainee at SCF.

**C.     Plaintiff warns Defendants that his life is in danger from other prisoners.**

50.     In the fall and winter of 2019, Plaintiff complained to Defendants Long, Dorsey, Barnes, Piel, Bedsaul, FNU LNU #1, and FNU LNU #2 about threats to his physical safety from other SCF prisoners, all to no avail.

51.     On several occasions in the summer and fall of 2019, Plaintiff informed Defendants Barnes, Peil, Custer, and Bedsaul that he was being threatened by a prisoner named

Martell White. Plaintiff told these Defendants that White had twice pulled a knife on Plaintiff and that White was extorting Plaintiff.

52.     Defendants Bedsaul and FNU LNU #2 were present on an occasion when White ran up to Plaintiff and pulled a knife on him. White stopped his attack on Plaintiff only because Defendants Bedsaul and FNU LNU #2 had entered the housing pod to do rounds. Plaintiff ran up to Defendant FNU LNU #2 and handed him a note telling him that (i) White had pulled a knife on him; (ii) Plaintiff was in danger; and (iii) Plaintiff was asking to be moved because White had said that as soon as the correctional officers left the housing pod, White would return to stab Plaintiff. Plaintiff also told these Defendants verbally what had occurred. Neither Defendant Bedsaul nor Defendant FNU LNU #2 did anything to protect Plaintiff. Instead, they waited a day before returning to search White's cell. Having given White a day to hide the knife, Defendants Bedsaul and FNU LNU #2 did not find it during the search. They then told Plaintiff there was nothing they could do.

53.     Because Defendants Bedsaul and FNU LNU #2 took no action in response to the threat posed to Plaintiff by White, the threats and extortion attempts against Plaintiff continued unchecked.

54.     Plaintiff informed Defendants Barnes, Piel, and Bedsaul that correctional officers, including Defendant Walters and other correctional officers, had been letting unauthorized prisoners into Plaintiff's cell to steal Plaintiff's belongings. None of these Defendants took any action on Plaintiff's complaints.

55.     Plaintiff told Defendant Dorcey on several occasions about the threats to his life

and safety. Plaintiff additionally complained to Defendant Dorcey that SCF staff had been

opening Plaintiff's cell door and thereby allowing other prisoners to steal Plaintiff's property.

56.     While incarcerated at SCF in late 2019 and early 2020, Plaintiff identified as

bisexual. At SCF, he openly befriended and associated with other prisoners who were socially

marginalized, including those who were gay or transgender.

57.     Plaintiff told Defendant Dorcey that he and other LGBTQ prisoners had been

subjected to threats, violence, and extortion. Plaintiff provided Defendant Dorcey the names of

two prisoners who had threatened him. Plaintiff additionally informed Defendant Dorcey that the

head of the Bloods gang had ordered that all LGBTQ prisoners and any of their associates could

no longer live in close custody in Unit 4 (Plaintiff's assigned housing unit) and that any who

remained would be subjected to assault, rape, robbery, and extortion. Plaintiff asked Defendant

Dorcey to move Plaintiff to another facility or unit where he could be in a safe environment.

Defendant Dorcey took no action regarding Plaintiff's requests and did nothing to protect

Plaintiff.

58.     Plaintiff told Defendants Barnes, Piel, Bedsaul, and FNU LNU #1 about the

threats and harassment he was receiving from other prisoners. Defendant Barnes, who was

leading the meeting, and Defendant Piel blamed Plaintiff for the danger he was in, telling him

that the reason he was having problems is because he associated with "the fags."

59.     This hurt and traumatized Plaintiff. With tears in his eyes, Plaintiff told them that

he found the statement highly offensive and inappropriate and that he himself is a member of the

LGBTQ community. In response, Defendants Barnes, Piel, and FNU LNU #1 laughed at Plaintiff.

60.     Plaintiff asked that he be moved from his housing pod for his safety. Defendants Barnes, Piel, Bedsaul, and FNU LNU #1 told Plaintiff they would place him in protective custody (i.e., 30 days of solitary confinement) pending the outcome of an investigation. They told Plaintiff that during that time, he would be labeled a "rat," he would lose his job, he would lose his single-cell assignment, and his canteen/commissary and property would be confiscated. They also told Plaintiff that, if at the end of the investigation there was insufficient evidence to substantiate his complaints, he would be returned to the same housing pod and situation with prisoners threatening and assaulting him and stealing from him.

61.     Plaintiff said he would be contacting his lawyers about this discrimination against and failure to protect LGBTQ prisoners including himself.

62.     In retaliation, Defendants immediately placed Plaintiff in solitary confinement against Plaintiff's will and without any hearing or due process. Plaintiff remained in solitary confinement for 15 days. During this time, Plaintiff lost personal property, his prison job, and his cell assignment. Defendants Barnes and Piel then had Plaintiff returned to the same dangerous housing unit and pod from which he had sought relief.

63.     Plaintiff later complained to Defendant Long that transgender and gay prisoners cannot safely live on the high side of Unit 4 at SCF (where Plaintiff was assigned to live). Defendant Long took no action to protect Plaintiff and instead passed the complaint on to Defendant Dorcey. Despite being warden of SCF, Defendant Long did nothing to ensure that Defendant Dorcey or other SCF staff took any steps to protect Plaintiff.

64.    Defendant Dorcey also did nothing to protect Plaintiff, simply saying that she would pass the information on to SCF intelligence.

65.    A month later, in December 2019, Plaintiff again told Defendant Dorcey about his sexuality and stated that the related codes SCF staff entered in the computer system made it difficult for him to be housed with anyone and asked to grieve these ratings. Defendant Dorcey said that Plaintiff could not grieve these ratings.

**D.    Incarcerated members of the LGBTQ community face a constant and heightened risk of violence.**

66.    Prison society is structured around hierarchies—hierarchy among staff, hierarchy between staff and prisoner, and hierarchy among prisoners. These social pecking orders dictate explicitly and implicitly how life is ordered toward and among the incarcerated.

67.    LGBTQ prisoners are toward the bottom of the pecking order among prisoner populations, including within the CDOC and SCF. It is well documented that LGBTQ people are especially vulnerable to abuse and mistreatment, by both staff and other prisoners. Data from the U.S. Bureau of Justice Statistics shows that prisoners who identified as lesbian, gay, or bisexual were approximately three times as likely to report sexual abuse as other prisoners.[2]

68.    Many LGBTQ prisoners face constant humiliation and degradation from staff and prisoners alike. "Staff—who often are responsible for perpetuating abuse themselves—may blame LGBTQ prisoners for their own victimization, believing they are 'flaunting themselves'

---

[2] Beck, A. J., Berzofsky, M., Caspar, R., & Krebs, C., Bureau of Justice Statistics, *Sexual Victimization in Prisons and Jails Reported by Inmates*, *2011-12* (2013), available at: https://www.bjs.gov/content/pub/pdf/svpjri1112.pdf (last accessed Oct. 30, 3023).

and refusing to take grievances or reports of abuse seriously."[3] "If their vulnerability is
recognized at all, it may be by placing them in indefinite solitary confinement, with little or no
activity or human contact—conditions that can cause serious psychological harm and trauma,
and which, as medical and human rights experts have found, can amount to torture."[4] In other
cases, LGBTQ prisoners' requests for temporary protective custody are ignored."[5]

69.     The Bureau of Justice Statistics also reports that lesbian, gay, and bisexual
prisoners are substantially more likely to be subjected to solitary confinement or segregation than
heterosexual prisoners.[6]

70.     A disturbing feature of prison culture in the United States and in Colorado is that
LGBTQ prisoners are routinely harassed, extorted, and/or physically abused by many other
prisoners.

71.     As corrections supervisors and staff, Defendants were all aware that Plaintiff and
other LGBTQ prisoners at SCF faced a heightened risk of being victimized by violence at the
hands of other prisoners.

**E.     Defendants knew of SCF's history of prisoner violence and the prevalence of
         weapons among the prisoner population.**

72.     Defendants also knew that SCF has a history of violence and a prevalence of
weapons among the prisoner population.

---

[3] *LGBTQ People Behind Bars: A Guide to Understanding the Issues Facing Transgender
Prisoners and Their Legal Rights* (National Center for Transgender Equality, Oct. 2018), at 6,
available at: https://transequality.org/transpeoplebehindbars (last accessed Oct. 30, 2023).
[4] *Id.*
[5] *Id.*
[6] Bureau of Justice Statistics, *Use of Restrictive Housing in U.S. Prisons and Jails, 2011–12*
(2015), available at: https://www.bjs.gov/content/pub/pdf/urhuspj1112.pdf (last accessed Oct.
30, 2023).

73.     Between 2010 and 2014, there were at least six prisoner-on-prisoner homicides at SCF.[7]

74.     SCF prisoners and their families have alleged that SCF staff have ignored threats made against certain prisoners and have even placed deadly enemies in cells together in order to punish them or "teach them a lesson," fully expecting violence to occur.[8]

75.     The CDOC has shown its willingness to move assaultive prisoners to avoid future violence, but only when the assaults were directed at CDOC staff. Former CDOC Executive Director Rick Raemisch said in 2017: "The Colorado Department of Corrections has a ZERO TOLERANCE policy for violence in our facilities. Our state's involvement in the Interstate Compact Agreement allows us to ensure our staff are protected from future assaults, and they will be moved out of this state. We will seek the strictest penalty."[9]

76.     The University of Denver Prison Research and Innovation Network (PRIN) published a report in 2022 that focused on SCF. PRIN reported that "[m]any incarcerated people and corrections staff report feeling unsafe while living and working at SCF. Both groups experience physical violence, and more frequently, verbal threats and abuse. Incarcerated people

---

[7] Alan Prendergast, *Sixth Murder at Sterling Triggers Investigation of Troubled Prison* (Westword, Aug. 13, 2014), available at  https://www.westword.com/news/sixth-murder-at-sterling-triggers-investigation-of-troubled-prison-5890374 (last accessed October 29, 2023).
[8] *Id.*
[9] *Colo. CO attacked by armed inmate* (Corrections1 by Lexipol, Aug. 11, 2017), available at https://www.corrections1.com/officer-safety/articles/colo-co-attacked-by-armed-inmate-7iXp2FO6JZfOYjcj/ (last accessed October 29, 2023).

report experiences of feeling threatened by other incarcerated people, by corrections staff, and specifically by gang violence in the prison."[10]

77.     The PRIN Report on SCF also documented the failures of leadership and supervision: "Many staff perceive management as disconnected from the day-to-day realities of the facility, and often, managerial decisions as arbitrary and ill-informed."[11]

78.     The PRIN Report on SCF also documented the dangers at SCF to people like Plaintiff: "[T]hose with marginalized identities – including transgender people, gay people, and people with sex offenses – are more likely to experience violence and victimization."[12]

**F.     Defendants knew that Cummings was a violent religious extremist.**

79.     Defendants were aware that Cummings was a violent religious extremist.

80.     Cummings committed an infamous crime that was known all over Colorado. He is a former member of the U.S. Army who killed an RTD security officer.

81.     Those who kill members of law enforcement (or those in positions closely related to law enforcement) pose a higher security risk and a recognized danger to corrections staff. Upon information and belief, SCF staff, including all Defendants, were aware of Cummings and the homicide for which he was serving prison time.

82.     It was additionally widely reported by the media that Cummings had claimed he had murdered the RTD security officer to demonstrate his allegiance to the extremist religious

---

[10] *Sterling Correctional Facility PRIN Report* (University of Denver, 2022), at iii, available at https://socialwork.du.edu/sites/default/files/2022-04/PRIN%202022%20Research%20Report.pdf (last accessed Oct. 29, 2023).
[11] *Id.* at iv.
[12] *Id.* at 22.

terrorist organization Islamic State (ISIS). Defendants were aware that Cummings is Muslim and had allegiances to this extremist terrorist group.

83.     The CDOC routinely determines if prisoners are members of an STG. At the relevant time, the CDOC defined an STG as: "A group of three or more individuals acting in concert or individually in an activity that is characterized by criminal conduct or conduct that violates the department's code of penal discipline for the purpose of disrupting prison operations, recruiting new members, damaging property or inflicting or threatening to inflict harm to employees, contract workers, volunteers or other state inmates."[13]

84.     ████████████████████████████████████████████

████████████████████████████

**G.     Defendants ignore Plaintiff's pleas for protection from Cummings.**

85.     Because of his sexual orientation and his friendships and association with other LGBTQ prisoners, Plaintiff was openly and repeatedly threatened by Cummings, who had taken over as the de facto leader of Islamic religious services at SCF.

86.     Seeking to avoid confrontation with Cummings and others who harassed and threatened LGBTQ prisoners, Plaintiff stopped attending services for a while. But in December 2019, when he won his appeal in the Colorado Supreme Court, he felt an abundance of gratitude and attended his first religious service in months.

---

[13] Administrative Regulation 650-03, *Administrative Segregation* (CDOC, May 15, 2012), available at https://www.law.umich.edu/special/policyclearinghouse/Documents/CO%20650-03.pdf (last accessed Oct. 30, 2023).

87.     After this service, Cummings sent another prisoner to tell Plaintiff he was not allowed to pray with the Muslim prisoners because of his sexual orientation and because he associated with LGBTQ prisoners.

88.     The threats from Cummings continued in early 2020. In early February 2020, Cummings threatened to kill Plaintiff. Plaintiff notified Defendants Dorsey, Barnes, Piel, Custer, and Bedsaul about Cummings' threats against him.

89.     In the first week of February 2020, Plaintiff told Defendant Custer verbally and in writing that Cummings was making threats to harm and kill Plaintiff for associating with LGBTQ prisoners and that Cummings was making threats to harm other LGBTQ prisoners in Unit 4. Other LGBTQ prisoners also informed Defendant Custer about Cummings' threats. But Defendant Custer took no action to protect Plaintiff from violence by Cummings.

90.     Plaintiff had previously filed multiple complaints and grievances against Defendant Custer for Defendant Custer's mistreatment and discrimination against Plaintiff due to Plaintiff's sexual orientation, race, and religion.

91.     Plaintiff repeatedly informed Defendant Dorcey of threats, including that Cummings had declared that he (Cummings) was a member of the ISIS Islamic terrorist group, that he had forcefully taken over Islamic Services for close security prisoners at SCF, and that since there was no staff supervision at Unit 4 services on Fridays, he was instituting Sharia law and would beat and or kill all Muslim prisoners who were LGBTQ or associated with LGBTQ or commit what Cummings deemed major crimes against Sharia law. Plaintiff told Defendant Dorcey that Cummings said Plaintiff was the first target.

92.     On or about February 10, 2020, several Defendants, including Defendants Custer, Barnes, Piel, and Bedsaul, met with Plaintiff to discuss his report of Cummings' threats. But these Defendants refused to take any action to protect Plaintiff from the convicted murderer and terrorist Cummings. Instead, they told Plaintiff to just "deal with it" and that they were not going to do anything about it.

93.     No Defendant took any action to protect Plaintiff from violence by the convicted murderer and terrorist Cummings. No Defendant took any step to move Plaintiff out of his housing pod, a place where he was at substantial risk of serious harm from Cummings and other prisoners. No Defendant took any step to move Cummings out of Plaintiff's housing pod so that he could not have access to Plaintiff to harm him. No Defendant referred Plaintiff's complaints for further action, investigation, or administrative steps. Instead, Defendants ignored this obvious and substantial risk of serious harm to Plaintiff's physical safety.

**H.    Defendants release convicted murderer and known Islamic extremist terrorist Cummings from his cell when he is supposed to be locked down, and Cummings attempts to kill Plaintiff by stabbing him multiple times with a shank.**

94.     It is the policy of the CDOC to establish and structure all prisoner movement as a means of ensuring the safety, security, and accountability of staff and prisoners.[14] Under CDOC policy, prisoner movement is supposed to follow established procedures to ensure security.[15]

95.     On the evening of February 11, 2020, Defendants Custer, Walters, and other unknown SCF personnel were on duty supervising SCF Unit 4 where both Plaintiff—then a pretrial detainee—and Cummings were housed.

---

[14] Administrative Regulation 300-55, *Offender Movement Schedule* (CDOC Jan. 15, 2020) at 1.
[15] *Id.*

96.     Defendant Custer was the housing lieutenant and supervisor for Unit 4 during the evening shift on February 11, 2020.

97.     The prisoners housed in this unit were divided into two separate groups. Due to security concerns, members of one group were not supposed to be out of their cells at the same time when members of the other group were out of their respective cells. Plaintiff was in Group One, and Cummings was in Group Two. All doors that could let a prisoner-member of either group out of his cell were controlled by SCF staff, under the supervision of Defendant Custer.

98.     Defendants Custer, Walters, and the other unknown corrections officers were responsible for ensuring that prisoners who were not supposed to be out of their cells were instead locked down. If a prisoner from one group in SCF Unit 4 had to come out when members of the other group in SCF Unit 4 were out of their cells, then that prisoner had to be escorted by a corrections officer.

99.     On the evening of February 11, 2020, Defendants Custer, Walters, and three other correctional staff allowed Cummings to remain outside of his cell when Plaintiff and the other members of Group One were released for free time in the housing pod. These Defendants ordered the members of Plaintiff's group, Group One, to be let out for free time in the housing pod while they simultaneously allowed Cummings to remain out of his cell, even though these defendants knew that Cummings was a convicted murderer and terrorist who had recently threated to kill Plaintiff.

100.     Cummings hid and lay in wait for Plaintiff. Unbeknownst to Plaintiff, but in full view of SCF security cameras, Cummings then snuck out from behind a curtain, walked around a stairwell, and approached Plaintiff from behind. Cummings then physically attacked Plaintiff,

chasing him around the housing pod and stabbing him repeatedly in the torso and head with a

homemade prison shank.

101.    Cummings first stabbed Plaintiff in the back of the head and slashed his ear.



102.    Plaintiff tried to run away, but—still in full view of SCF security cameras—

Cummings continued to chase him:



103.    Cummings repeatedly caught up to Plaintiff, stabbing and slashing him over and over, all in the clear view of SCF security cameras.







104.    Cummings chased Plaintiff into the dayroom of the housing pod, where he continued to slice and stab Plaintiff, while Defendants Custer, Walters, and other corrections officers watched either on camera or directly from the security booth, waiting before intervening and failing to open the housing pod door to enter to stop the assault or allow Plaintiff to access a place of safety.

105.    At one point Cummings had Plaintiff with his back against a table with Cummings standing over him, stabbing at him:



106.    Then Cummings continued his assault on Plaintiff when Plaintiff was on the ground next to the table:



107.    Then again Cummings had Plaintiff against the table while Cummings was standing over him, continuing his attack:



108.    As a result of Cummings' attack, Plaintiff suffered at least seven stab wounds or lacerations.

109.    After being stabbed and sliced at least seven times, Plaintiff was finally able to get away from Cummings when Defendants Custer, Walters, FNU LNU #2, FNU LNU #3, and FNU LNU #4 eventually opened the door to the housing pod.



110.    Only after Plaintiff had managed to escape Cummings' attack did SCF staff, including Defendant Custer, enter the dayroom, where they ultimately handcuffed not just Cummings but also Plaintiff.

**I.    Instead of immediately obtaining medical treatment for Plaintiff, who was bleeding from multiple stab wounds and was the obvious victim of a brutal assault, Defendant Custer ordered that Plaintiff be handcuffed and placed in a dirty broom closet.**

111.    Defendant Custer was aware that Plaintiff has a documented disability-related accommodation and restriction requiring that he not be handcuffed behind his back. Despite this knowledge, Defendant Custer ordered CDOC staff to handcuff Plaintiff behind his back and assisted in handcuffing Plaintiff, all while Plaintiff stood bleeding and in severe pain from his multiple stab wounds.

112.    After Plaintiff was handcuffed, Defendant Custer did not have Plaintiff immediately taken to receive medical care. Nor did Defendant Custer take any steps to stop the

bleeding from Plaintiff's multiple stab wounds. Instead, Defendant Custer ordered that Plaintiff be placed in a filthy closet used for mops, brooms, and dirty laundry. As a result of Defendant Custer's order, Plaintiff was locked in the unsanitary broom closet, handcuffed, bleeding from multiple serious wounds, and in severe pain. While he was locked in the broom closet without access to immediate medical treatment, Plaintiff was aware he had been stabbed multiple times but did not know how long it would be before CDOC staff would take him to receive medical treatment. Plaintiff continued to suffer increasing pain and was afraid he might die from his multiple, untreated stab wounds while locked in the dirty broom closet.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983 — Deliberate Indifference to a Substantial Risk of Serious Harm
### Violation of the Eight and Fourteenth Amendments
### (All Defendants)

113.    Plaintiff incorporates by reference the foregoing paragraphs of this Second Amended Complaint as if set forth fully herein.

114.    Plaintiff brings this claim against all Defendants.

115.    At all times relevant to the allegations in this Second Amended Complaint, Defendants acted or failed to act under color of state law.

116.    Defendants' actions and inactions were conducted within the scope of their respective official duties or employment.

117.    Defendants are persons under 42 U.S.C. § 1983.

118.    Defendants had a duty to protect Plaintiff from violence by other prisoners.

119.    Defendants knew of the substantial risk of serious harm to Plaintiff from other prisoners as a result of his sexual orientation.

120.     Defendants knew that Cummings, a convicted murderer and professed Islamic terrorist, had specifically threatened Plaintiff's life.

121.     Nevertheless, with knowing, deliberate, callous, and wanton indifference to Plaintiff's right to be protected from violence at the hands of other prisoners, Defendants failed to protect Plaintiff from the foreseeable attack by Cummings.

122.     Defendants failed to move either Plaintiff or Cummings out of Unit 4.

123.     Not only did Defendants fail to protect Plaintiff from Cummings, but Defendants Custer, Walters, FNU LNU #2, FNU LNU #3, and FNU LNU #4 exacerbated the danger to and injuries suffered by Plaintiff by permitting Cummings to be outside of his cell when he was supposed to be locked down and when members of Group One, including Plaintiff, were out of their cells and in the day hall of the housing pod, thus allowing Cummings an opportunity to sneak up and attack Plaintiff at a time when Plaintiff would have reason to believe that Cummings was locked down in his cell.

124.     Given the danger to LGBTQ prisoners generally, Cummings' specific threats against Plaintiff, and Cummings' background as having committed a murder inspired by his Islamic terrorist beliefs, the risk to Plaintiff's safety posed by housing Cummings in the same housing unit with Plaintiff was obvious to Defendants.

125.     Defendants were aware that Plaintiff faced a substantial risk of death or serious bodily injury at the hands of Cummings.

126.     Defendants took no action whatsoever to protect Plaintiff from Cummings.

127.     But for the above actions and inactions of Defendants, Plaintiff would not have been subjected to the attempted murder and assault by stabbing perpetrated by Cummings on

February 11, 2020, which was a violation of Plaintiff's constitutional right to be free from cruel

and unusual punishment and indeed from *any* punishment, given that he was a pretrial detainee at

the time of the attack.

128.    The February 11, 2020 attack on Plaintiff by Cummings was a natural and

foreseeable consequence of Defendants' actions and inactions.

129.    Defendants' actions and inactions were malicious, intentional, willful and/or

wanton, and deliberately indifferent to, and showed a reckless disregard for, Plaintiff's

constitutionally protected right to safety.

130.    As a direct and proximate result of Defendants' actions and inactions, Plaintiff

suffered a severe and brutal attempted murder and assault on February 11, 2020, during which he

was stabbed at least seven times and reasonably feared for his life.

131.    As a direct and proximate result of Defendants' actions and inactions, Plaintiff

was almost murdered and experienced considerable pain, extensive bodily injuries, emotional

distress, humiliation, psychological harm, disfigurement, disability, and dignitary injuries that

continue to this day, and will continue in the future.

132.    The acts and/or omissions of each Defendant as described herein intentionally

deprived Plaintiff of the securities, rights, privileges, liberties, and immunities secured by the

United States Constitution, and caused him other damages.

133.    Defendant Long also has supervisory liability because there is an affirmative link

between the failure to protect Plaintiff and Defendant Long's failure to supervise SCF staff under

his supervision, including Defendants Dorcey and Custer. Defendant Long was aware of the

danger Cummings posed to Plaintiff, but he did nothing to protect Plaintiff from Cummings and

instead merely passed Plaintiff's concerns along to Defendant Dorcey. Defendant Long did

nothing to follow up and nothing to ensure that anyone under his supervision took any steps to

protect Plaintiff. Additionally, as evidenced by Defendant Long's refusal to take any action on

Plaintiff's stated concerns about his safety, Defendant Long promulgated, created, implemented,

or possessed responsibility for a policy that LGBTQ prisoners who were threatened by other

prisoners were not to be moved to a safer housing location and that prisoners who threatened

LGBTQ prisoners also were not to be moved to a different housing location. The result of this

policy was that Cummings remained in the same housing unit with Plaintiff and thereby was able

to attack Plaintiff. In promulgating, creating, implementing, or possessing responsibility for this

policy, Defendant Long acted with deliberate indifference to the substantial risk of serious harm

to Plaintiff, who was and is bisexual. Furthermore, as warden of SCF, Defendant Long had the

duty to supervise SCF corrections staff, including Defendants Custer and Dorcey. Defendant

Long's duty to supervise included ensuring that SCF corrections staff took steps to protect

LGBTQ prisoners from violence by other prisoners. Defendant Long's failure to supervise

caused the violation of Plaintiff's right to be free from violence at the hands of another prisoner.

134.    Defendant Dorcey also has supervisory liability because there is an affirmative

link between the failure to protect Plaintiff and Defendant Dorcey's failure to supervise SCF

staff under her supervision, including Defendants Custer, Barnes, and Piel. Defendant Dorcey

was aware of Plaintiff's concerns for his safety, but she took no action to protect Plaintiff and

even told him that he could not file a grievance about his housing situation. Defendant Dorcey

did not ensure that any SCF staff under her supervision took any steps to protect Plaintiff.

Defendant Dorcey permitted staff under her supervision, including Defendants Custer, Barnes,

Piel, and Bedsaul, to tell Plaintiff to "just deal with" the threats. Additionally, as evidenced by

Defendant Dorcey's refusal to take any action on Plaintiff's stated concerns about his safety,

Defendant Dorcey promulgated, created, implemented, or possessed responsibility for a policy

that LGBTQ prisoners who were threatened by other prisoners were not to be moved to a safer

housing location and that prisoners who threatened LGBTQ prisoners also were not to be moved

to a different housing location. Defendant Dorcey also promulgated, created, implemented, or

possessed responsibility for a policy that LGBTQ prisoners concerned for their safety as the

result of housing decisions could not raise such concerns through the administrative-remedy

process. The result of this policy was that Cummings remained in the same housing unit with

Plaintiff and thereby was able to attack Plaintiff. In promulgating, creating, implementing, or

possessing responsibility for this policy, Defendant Dorcey acted with deliberate indifference to

the substantial risk of serious harm to Plaintiff. Furthermore, as a major at SCF, Defendant

Dorcey had the duty to supervise other corrections staff including Defendants Custer, Barnes,

and Piel. Defendant Dorcey's duty to supervise included ensuring that SCF staff took steps to

protect LGBTQ prisoners. Defendant Dorcey's failure to supervise caused the violation of

Plaintiff's right to be free from violence at the hands of another prisoner.

135.    Defendant Barnes also has supervisory liability because there is an affirmative

link between the failure to protect Plaintiff and Defendant Barnes' failure to supervise SCF staff

under his supervision. Defendant Barnes was aware of the danger to Plaintiff but did nothing to

protect Plaintiff. As the housing captain and supervisor for Unit 4, Defendant Barnes had a duty

to ensure that Defendant Custer and others under Defendant Barnes' supervision did not allow

Cummings to be released from his cell at a time when Cummings was supposed to have been

locked down in his cell because members of Group One, including Plaintiff, were out of their cells for free time in the housing pod. Defendant Barnes' failure to fulfill this duty allowed Cummings to attack Plaintiff. Defendant Barnes did nothing about Plaintiff's stated fears and even laughed at Plaintiff, telling him the danger was his own fault because he associated with "the fags." Defendant Barnes did this in the presence of those he supervised and allowed those he supervised to do the same. Defendant Barnes did nothing to ensure that anyone under his supervision took any steps to protect Plaintiff. Additionally, as evidenced by Defendant Barnes' refusal to take any action on Plaintiff's stated concerns about his safety, Defendant Barnes promulgated, created, implemented, or possessed responsibility for a policy that LGBTQ prisoners who were threatened by other prisoners were not to be moved to a safer housing location and that prisoners who threatened LGBTQ prisoners also were not to be moved to a different housing location. The result of this policy was that Cummings remained in the same housing unit with Plaintiff and thereby was able to attack Plaintiff. In promulgating, creating, implementing, or possessing responsibility for this policy, Defendant Custer acted with deliberate indifference to the substantial risk of serious harm to Plaintiff and other LGBTQ prisoners. Defendant Barnes' duty to supervise included ensuring that SCF staff took steps to protect Plaintiff. Defendant Barnes' failure to supervise caused the violation of Plaintiff's right to be free from violence at the hands of another prisoner.

136.    Defendant Custer also has supervisory liability because there is an affirmative link between the failure to protect Plaintiff and Defendant Custer's failure to supervise SCF staff under his supervision. Defendant Custer was aware of the danger to Plaintiff but did nothing to protect Plaintiff. In fact, when Defendant Custer was the housing lieutenant and supervisor for

Unit 4, he allowed other SCF staff to release Cummings from his cell at a time when Cummings

was supposed to be locked down in his cell because members of Group One including Plaintiff

were out of their cells for free time in the housing pod. Defendant Custer's failure to fulfill this

duty allowed Cummings to attack Plaintiff. Defendant Custer did nothing about Plaintiff's stated

fears. Defendant Custer did nothing to ensure that anyone under his supervision took any steps to

protect Plaintiff. Additionally, as evidenced by Defendant Custer's refusal to take any action on

Plaintiff's stated concerns about his safety, Defendant Custer promulgated, created,

implemented, or possessed responsibility for a policy that LGBTQ prisoners who were

threatened by other prisoners were not to be moved to a safer housing location and that prisoners

who threatened LGBTQ prisoners also were not to be moved to a different housing location. The

result of this policy was that Cummings remained in the same unit with Plaintiff and thereby was

able to attack Plaintiff. In promulgating, creating, implementing, or possessing responsibility for

this policy Defendant Custer acted with deliberate indifference to the substantial risk of serious

harm to Plaintiff. Furthermore, as a housing lieutenant, Defendant Custer had the duty to

supervise those under him. Defendant Custer's duty to supervise included ensuring that SCF staff

took steps to protect Plaintiff and other LGBTQ prisoners. Defendant Custer's failure to

supervise caused the violation of Plaintiff's right to be free from violence at the hands of another

prisoner.

  137. Defendant Piel also has supervisory liability because there is an affirmative link

between the failure to protect Plaintiff and Defendant Piel's failure to supervise SCF staff under

his supervision. Defendant Piel was aware of the danger to Plaintiff but did nothing to protect

Plaintiff. Defendant Piel did nothing about Plaintiff's stated fears and even laughed at Plaintiff,

telling him, along with Defendant Barnes, that the danger was his own fault because he

associated with "fags." Defendant Piel did nothing to ensure that anyone under his supervision

took any steps to protect Plaintiff. Additionally, as evidenced by Defendant Piel's refusal to take

any action on Plaintiff's stated concerns about his safety, Defendant Piel promulgated, created,

implemented, or possessed responsibility for a policy that LGBTQ prisoners who were

threatened by other prisoners were not to be moved to a safer housing location and that prisoners

who threatened LGBTQ prisoners also were not to be moved to a different housing location. The

result of this policy was that Cummings remained in the same unit with Plaintiff and thereby was

able to attack Plaintiff. In promulgating, creating, implementing, or possessing responsibility for

this policy, Defendant Custer acted with deliberate indifference to the substantial risk of serious

harm to Plaintiff. Defendant Piel's duty to supervise included ensuring that SCF staff took steps

to protect Plaintiff and other LGBTQ prisoners. Defendant Piel's failure to supervise caused the

violation of Plaintiff's right to be free from violence at the hands of another prisoner.

### SECOND CLAIM FOR RELIEF
**42 U.S.C. § 1983 — Deliberate Indifference to a Substantial Risk of Serious Harm**
**(Failure to Timely Transfer)**
**Violation of the Fourteenth Amendment**
**(All Defendants)**

138.    Plaintiff incorporates by reference the foregoing paragraphs of this Second

Amended Complaint as if set forth fully herein.

139.    Plaintiff brings this claim against all Defendants.

140.    At all times relevant to the allegations in this Second Amended Complaint,

Defendants acted or failed to act under color of state law.

141.    Defendants' actions and inactions were conducted within the scope of their respective official duties or employment.

142.    Defendants are persons under 42 U.S.C. § 1983.

143.    While Plaintiff was a pretrial detainee at SCF, Defendants failed to guarantee his safety, leading to the assault by Cummings.

144.    Defendants' failure to transfer Plaintiff to a facility appropriate for a pretrial detainee, such as the Jefferson County Jail, resulted in injuries to Plaintiff.

145.    By failing to transfer Plaintiff to a facility appropriate for a pretrial detainee, such as the Jefferson County Jail, Defendants were deliberately indifferent to the substantial risk of serious harm to Plaintiff from remaining at SCF and posed by Cummings and his threats.

146.    But for the above actions and inactions of Defendants, Plaintiff would not have been subjected to the attempted murder and assault by stabbing perpetrated by Cummings on February 11, 2020, which was a violation of Plaintiff's constitutional right to be free from cruel and unusual punishment and indeed from *any* punishment, given that he was a pretrial detainee at the time of the attack.

147.    The February 11, 2020 attack on Plaintiff by Cummings was a natural and foreseeable consequence of Defendants' actions and inactions.

148.    Defendants' actions and inactions were malicious, intentional, willful and/or wanton, and deliberately indifferent to, and showed a reckless disregard for, Plaintiff's constitutionally protected right to safety.

149.    As a direct and proximate result of Defendants' actions and inactions, Plaintiff

suffered a severe and brutal attempted murder and assault on February 11, 2020, during which he

was stabbed at least seven times and reasonably feared for his life.

150.    As a direct and proximate result of Defendants' actions and inactions, Plaintiff

was almost murdered and experienced considerable pain, extensive bodily injuries, emotional

distress, humiliation, psychological harm, disfigurement, disability, and dignitary injuries that

continue to this day, and will continue in the future.

151.    The acts and/or omissions of each Defendant as described herein intentionally

deprived Plaintiff of the securities, rights, privileges, liberties, and immunities secured by the

United States Constitution, and caused him other damages.

**THIRD CLAIM FOR RELIEF**
**42 U.S.C. § 1983 — Deliberate Indifference to Serious Medical Needs**
**Violation of the Fourteenth Amendment**
**(Defendant Custer)**

152.    Plaintiff incorporates by reference the foregoing paragraphs of this Second

Amended Complaint as if set forth fully herein.

153.    Plaintiff brings this claim against Defendant Custer.

154.    At all times relevant to the allegations in this Second Amended Complaint,

Defendant Custer acted or failed to act under color of state law.

155.    Defendant Custer is a person under 42 U.S.C. § 1983.

156.    Defendant Custer actually knew that Plaintiff was bleeding from multiple stab

wounds but denied him the ability to receive immediate medical treatment for these serious

injuries.

157.    Defendant Custer was deliberately indifferent to Plaintiff's serious medical needs by ordering that he be locked in a dirty broom closet instead of taken for immediate medical treatment for his multiple stab wounds.

158.    Defendant Custer recklessly denied Plaintiff seriously needed medical care, causing Plaintiff severe emotional distress.

159.    Defendant Custer's actions and inactions were conducted within the scope of his official duties or employment.

160.    As a direct and proximate result of Defendant Custer's actions and inactions, Plaintiff—having just suffered a severe and brutal attempted murder and assault on February 11, 2020, during which he was stabbed at least seven times—suffered increasing pain and feared for his life while he was bleeding from multiple stab wounds while locked in a filthy broom closet instead of receiving appropriate medical care.

161.    As a direct and proximate result of Defendant Custer's actions and inactions, Plaintiff experienced considerable pain, emotional distress, humiliation, psychological harm, and dignitary injuries that continue to this day, and will continue in the future.

162.    As a result of Defendant Custer's actions and inactions, Plaintiff has suffered and will continue to suffer substantial harm from psychological injury, including emotional distress.

163.    Defendant Custer's actions and inactions were malicious, intentional, willful and/or wanton, and deliberately indifferent to, and showed a reckless disregard for, Plaintiff's constitutionally protected right to have his serious medical needs met.

164.    The acts and/or omissions of Defendant Custer as described herein intentionally deprived Plaintiff of the securities, rights, privileges, liberties, and immunities secured by the United States Constitution, and caused him other damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against the Defendants, and award him all relief as allowed by law and equity, including, but not limited to, the following:

a)    All appropriate relief at law and equity;

b)    Actual economic damages as established at trial;

c)    Compensatory and consequential damages, including, but not limited to, emotional distress, suffering, loss of reputation, humiliation, inconvenience, mental anguish, disability, disfigurement, discomfort, loss of enjoyment of life, and other pain and suffering, on all claims allowed by law in an amount to be determined at trial;

d)    Punitive damages for all claims allowed by law in amount to be determined at trial;

e)    Pre-judgment and post-judgment interest at the highest lawful rate;

f)    Attorneys' fees and the costs associated with this action as allowed by law, including expert witness fees; and

g)    Any further relief that this Court deems just and proper, and

h)    Any other relief as allowed by law.

PLAINTIFF REQUESTS A TRIAL TO A JURY ON ALL ISSUES SO TRIABLE.

Dated this 30th day of October 2023.

JOHNSON & KLEIN, PLLC

s/ Gail K. Johnson

**Gail K. Johnson**
Eric K. Klein
5398 Manhattan Circle
Boulder, CO 80303
(303) 444-1885
(866) 340-8286 (fax)
gjohnson@johnsonklein.com
eklein@johnsonklein.com

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on October 30, 2023, I filed a copy of the foregoing SECOND

AMENDED COMPLAINT AND JURY DEMAND via the ECF system, which will serve

counsel for the government as follows:

Christopher William Van Hall
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 10th Floor
Denver, CO 80232
Email: christopher.vanhall@coag.gov

Philip Timothy Barrett
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 10th Floor
Denver, CO 80232
Email: philip.barrett@coag.gov

s/ Holly Koehler
Holly Koehler